UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
WILLIE TILLMAN,

                              Plaintiff,

   -against-

FORSTER & GARBUS LLP;
ABRAHAMSEN GINDIN LLC;
ATLANTIC CREDIT & FINANCE
SPECIAL FINANCE UNIT, LLC;
ATLANTIC CREDIT & FINANCE, INC.;
AND MIDLAND CREDIT MANAGEMENT, INC.

                    Defendants.
-------------------------------------------------------------------x

Civil Action No. 1:26-cv-2470

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Willie Tillman ("Plaintiff" or "Mr. Tillman"), by his attorneys The Legal Aid Society and

The Law Office of Ahmad Keshavarz, files suit against debt collection law firms Forster & Garbus

LLP and Abrahamsen Gindin LLC (collectively "Attorney Defendants"); judgment creditor

Atlantic Credit & Finance Special Finance Unit, LLC ("ACF Special Finance") and its affiliate

Atlantic Credit & Finance, Inc., ("ACF") (collectively "Atlantic Defendants"); and Midland Credit

Management, Inc. ("MCM"), the servicer for the Atlantic Defendants, for their violations of the

Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. sec.* (the "FDCPA"), General Business

Law ("GBL") § 349, for conversion, and for gross negligence, and alleges as follows:

## SUMMARY OF CLAIMS[1]

On or about June 3, 2025, Mr. Tillman opened his bank account to pay his bills and found

nearly all of the money to his name had been frozen—suddenly lost to him. Mr. Tillman

---

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

understands loss. In or around May 2021, he woke up in a hospital bed and learned his right leg had been amputated. A few weeks later, doctors amputated his left leg. These amputations followed weeks of Mr. Tillman asking, then pleading, with doctors about an infection in his foot causing him considerable pain. Despite this, multiple doctors on numerous occasions insisted that there was nothing wrong with him and told him to go home, which he did. A week or so later, when the pain became unbearable, he called 911, one of the last things he remembers before waking up in the hospital.

In early June 2025, Mr. Tillman learned that his bank account, which contained exclusively Social Security Disability, his only source of income, was frozen when he attempted to access funds in his account to pay bills at the beginning of the month. Confused and panicked, he thought there must be some mistake and contacted his bank; his bank provided him with the contact information for Forster & Garbus, the law firm that issued the restraint on his account, and the New York City Marshal hired to enforce a judgment against him by executing the restraint.

Mr. Tillman diligently contacted Defendants and notified them that his bank account exclusively contained income from Social Security Disability, which is explicitly protected from collection under state and federal laws. However, Defendants refused to release their illegal restraint on his bank account and used it to try to pressure him into a settlement agreement. Then, Defendants levied $9,561.94 of Mr. Tillman's savings. After illegally levying Mr. Tillman's savings, Defendants repeatedly dismissed and ignored Mr. Tillman's repeated written communications offering proof that the funds in his bank account were Social Security Disability and exempt from collection. Instead, Defendants refused to release Mr. Tillman's account and doubled down on their decision to levy his funds.

The restraint and subsequent levy of nearly $10,000 from Mr. Tillman's bank account—

his only source of income and nearly all of his life savings—was a devastating setback at a time when he was reacclimating to the world without his legs, when he had just started to feel comfortable in his wheelchair in public spaces, and gained a new sense of independence as a result. It had an immediate impact on his mental and physical health and his quality of life. It stole some of his newfound independence because he became acutely aware that he could no longer afford purchases outside of the most basic necessities, not knowing if he would ever get his money back. He stopped going out to eat and avoided going certain places altogether in order to avoid spending money in light of his new financial circumstances. When Defendants levied the funds from his bank account, it was a financial blow from which he worried he would never recover, especially because he has been unable to work since losing his legs.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction pursuant to the FDCPA, 15. U.S.C. § 1692k(d), and under 28 U.S.C. § 1331.

2.     This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they share a common nucleus of operative fact with the federal claim and are so related to the federal claim as to form part of the case or controversy under Article III of the United States Constitution.

3.     Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

4.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to Plaintiff's claims herein occurred within the Eastern District of New York.

**PARTIES**

*Plaintiff.*

5.      Plaintiff Willie Tillman is a 61-year-old Black man who lives in Brooklyn, New York. He is a double amputee, losing both legs from the knees down in 2021. He is low-income, living solely on Social Security Disability.

*Defendants.*

6.      Defendant Atlantic Credit & Finance Special Finance Unit, LLC ("ACF Special Finance") is a limited liability company organized and existing under the laws of the Commonwealth of Virgina. The Virginia Secretary of the Commonwealth lists 100 Shockoe Slip Fl 2, Richmond, VA 23219-4100 as its registered office address. *See* **Exhibit 1** (Atlantic Credit, VA State Corporation Commission, Entity and Agent Information).

7.      ACF Special Finance is the plaintiff in a collection lawsuit against Mr. Tillman in Kings County Civil Court in 2015.

8.      Atlantic Credit & Finance, Inc. ("ACF") is, according to its website, the apparent principal of two related purchasers of defaulted consumer debt, Defendant ACF Special Finance and a similarly named debt buyer, Atlantic Credit & Finance Special Finance Unit III, LLC. *See* **Exhibit 2** (ACF website, April 20, 2026).  Throughout this complaint, ACF Special Finance and ACF are collectively referred to as "Atlantic Defendants."

9.      Defendant Midland Credit Management, Inc. ("MCM") is a corporation organized and existing under the laws of the State of Kansas. *See* **Exhibit 3** (Midland Credit, Kansas Secretary of State Business Search).

10.     MCM is the servicer of all ACF accounts, according to the ACF website.  *See* **Exhibit 2** (ACF website, April 20, 2026). The three ACF entities and MCM are, according the ACF website,

fully owned subsidiaries of Encore Capital Group, Inc, an international debt collection agency with income of $629 million in 2025. *See* **Exhibit 4** (ACF Website, About Atlantic Credit and Finance, April 1, 2026).

11.     The Atlantic Defendants and MCM are each licensed debt collectors with New York City's Department of Consumer and Worker Protection ("DCWP"). *See* **Exhibit 5** (Atlantic Credit, DCWP License Search); **Exhibit 6** (Midland Credit, DCWP License Search). ACF and ACF Special Finance list the same business address with the DCWP, 111 Franklin Road, Suite 400, Roanoke, VA 24011, *see* **Exhibit 5** (Atlantic Credit, DCWP License Search)[2], at one of the twelve licenses issued by DCWP to MCM. **Exhibit 6** (Midland Credit, DCWP License Search).

12.     Debt collection servicers such as MCM take all of the affirmative steps to collect on debts owned by another entity, here the Atlantic Defendants. Consequently, MCM is jointly and severally liable for the affirmative steps it takes on behalf of the Atlantic Defendants. A common role for servicers is to arrange for law firms to collect for debt buyer clients. In the case at bar, one of the checks ultimately returning the exempt funds was issued from an attorney trust account specifically set up for Midland. *see* **Exhibit 28** (Check issued from "Attorney Trust Account – Midland" with a memo indicating it is for "Exempt Funds").

13.     Defendant Forster & Garbus LLP ("F&G") is a debt collection law firm organized as a limited liability partnership under the laws of the State of New York. The New York Department of State lists 2950 Express Drive South, Suite 234, Islandia, NY 11749 as its principal place of business. *See* **Exhibit 7** (Forster & Garbus, NY Department of State, Entity Information). F&G is licensed as a debt collector with DCWP and its listed business address with DCWP is 2950 Express Drive, Suite 100, Islandia, NY 11749. *See* **Exhibit 8** (Forster & Garbus, DCWP License Search).

---

[2] Upon information and belief and based on the Summons and Complaint filed against Mr. Tillman in 2015, Defendant ACF Special Finance previously listed 3353 Orange Ave, Roanoke, VA 23012 as its address.

14.    F&G was the collection law firm that brought the 2015 lawsuit for ACF Special Finance against Mr. Tillman.  *See* **Exhibit 9** (Summons and Complaint, CV-018798-15-KI).

15.    Defendant Abrahamsen Gindin, LLC ("AG") is a limited liability company organized under the laws of the Commonwealth of Pennsylvania. The Pennsylvania Department of State lists 220 Penn Ave., Suite 210, Scranton, PA 18503 as its principal place of business. *See* **Exhibit 10** (Abrahamsen Gindin, PA Department of State Business Search). AG is a licensed debt collector by DCWP. On its DCWP license, it lists 245 Main Street, Dickson City, PA 18519 as its business address. *See* **Exhibit 11** (Abrahamsen Gindin, DCWP License Search).

16.    The F&G and AG law firms seem to be integrated as a joint enterprise.  F&G is a wholly-owned subsidiary of AG, according to the AG website. *See* **Exhibit 12** (Abrahamsen Gindin Website, Home Page, April 14, 2026); **Exhibit 13** (Abrahamsen Gindin Website, AG Law Acquires F&G, April 2, 2026).  According to the AG website and their written communications in connection with the collection lawsuit, F&G and AG are an integrated collection firm. A Google search for the F&G website automatically forwards you to the AG website. *See* **Exhibit 14** (Abrahamsen Gindin Website, F&G Redirect Page, April 22, 2026, p. 1). The AG website describes the "synergy" between the firms. *Id.*  There is an integrated payment portal for the firms. *Id.*, p. 18. The email address listed for the F&G attorney issuing the bank restraint is an AG email address. *See* **Exhibit 17** (Documents Received from Bank, p. 2) ([litigation@ag-lawllc.com](mailto:litigation@ag-lawllc.com)).  The letter which accompanied the refund of most of Mr. Tillman's wrongfully-levied money was from Defendant AG, despite the checks themselves being drawn from F&G bank accounts, suggesting close integration of the firms' operations and control of F&G by AG. *See* **Exhibit 29** (Confirmation of Refund, December 24, 2025).

17.    For these and other reasons F&G and AG are jointly and severally liable. As such, F&G

and AG are collectively the "Attorney Defendants."

18.    The Attorney Defendants are the freely chosen agents of the Atlantic Defendants and of MCM, operating within the course and scope of their agency. MCM is the freely chosen agent of the Atlantic Defendants operating in the course and scope of their agency. Therefore, all Defendants are jointly and severally liable, and this complaint will use the term "Defendants" or "all Defendants" to reflect that joint and several liability.

## STATEMENT OF FACTS

### Background: Mr. Tillman had a joyful life as a chef until a medical error left him with both legs amputated from the knee down.

19.    Mr. Tillman was a dedicated and acclaimed culinary professional who spent decades building his career in the restaurant industry through hard work, discipline and perseverance.

20.    Mr. Tillman studied hotel and restaurant management in New York City and graduated from culinary school in 1985 when he began working in kitchens across the city, steadily developing his skills and experience.

21.    Over the next decade, while working as a line cook, he ultimately earned himself and Brothers Bar-B-Q a feature on NBC's *Today* show as part of a local restaurant review segment.

22.    A few years later, in or around 1997, as Mr. Tillman continued to advance his way through a highly demanding and fast-paced industry as a line cook, he eventually landed an offer as sous chef at Time Café when the company first opened its location.

23.    In or around 1998, as Mr. Tillman's skills and knowledge of the culinary arts progressed, he was offered the head chef position at Joe's Pub, The Public Theater's newly opened restaurant in New York City that hosts live performances amongst other vibrant activities.

24.    As head chef, Mr. Tillman managed the high-pressure kitchen environment with precision, responding to real-time demands, staff shortages, equipment malfunctions and the risk of error, all

7

while maintaining quality and efficiency.

25.    In or around 2001, Mr. Tillman's talented reputation as head chef earned Joe's Pub public recognition in *The New York Times* in its weekly "Restaurant Review" column.

26.    Mr. Tillman worked at Joe's Pub for approximately ten years before leaving to expand his career.

### *Background: Mr. Tillman becomes disabled and a double amputee, but by 2025, he finally starts regaining some sense of normalcy – until upended by Defendants*

27.    Over the next few years, Mr. Tillman experienced medical challenges that limited his ability to work and pursue his passion for cooking.

28.    As a result, Mr. Tillman applied for Social Security Disability ("SSD") benefits and was approved in or around 2015 due to his mobility limitations.

29.    Moreover, since then, SSD benefits have been Mr. Tillman's primary and sole source of income.

30.    In or around 2021, after frequent medical appointments and consultations, doctors amputated Mr. Tillman's right leg, followed by the amputation of his left leg a few weeks later.

31.    Following the amputations of his legs, Mr. Tillman experienced significant anxiety, including a fear of falling from his wheelchair despite being properly secured, as well as a fear of leaving his home.

32.    Mr. Tillman worked through physical therapy to regain a sense of self and identity, and during this period, he began to reengage with his love of cooking and created an Instagram page titled "chef_will_here" to engage the public with cooking tutorials and unique recipes he learned during the three decades of being a culinary professional. Mr. Tillman does not receive any income from this hobby.

*Defendants restrain, seize, and refuse to return for many months the Social Security Disability funds in Mr. Tillman's bank account—almost his entire life's savings—despite repeated notice that the funds were exempt.*

33.     In 2025, Mr. Tillman received $2,332.20 per month before mandatory deductions directly deposited into his Chase account from the Social Security Administration. *See* **Exhibit 15** (Social Security Benefit Verification Letter. September 5, 2025). The deposits are reflected on his bank statements as from "SSA Treas." *See* **Exhibit 16** (Chase Bank Statements, Combined, 2024-10-08 to 2025-08-08).

34.     Unbeknownst to Mr. Tillman, the Attorney Defendants executed an information subpoena and bank restraint ("Restraint") dated April 30, 2025. *See* **Exhibit 17** (Documents Received from Bank, September 5, 2025) (p. 2).[3] The attorney signature states the attorneys are from F&G. Critically, the email address they list is for AG.  *Id*. (litigation@ag-lawllc.com). Despite the date on the Restraint, on information and belief the Attorney Defendants did not send the Restraint to the bank until on or about May 29, 2025.  The header on Exhibit 17 shows it was faxed to the bank on May 29, 2025. The restraint of Mr. Tillman was a few days later, on or about June 2, 2025. A Legal Processing Fee, which is accessed shortly after the bank receives the Restraint, was first imposed on June 2, 2025.  *See* **Exhibit 16** (Chase Bank Statements) p. 8.

35.     On or around June 3, 2025, Mr. Tillman logged into his JPMorgan Chase Bank, N.A. ("Chase" or "Chase Bank") account online to pay his monthly bills and discovered that approximately $10,000 of his funds had suddenly been restrained and appeared to be missing from his account, meaning that he no longer had the ability to use these funds. *See id.*

36.     Panicked, Mr. Tillman called Chase to find out what was going on. The Chase representative informed him they had received a bank restraint from a law firm seeking to collect

---

[3] Mr. Tillman was never sent a copy Exhibit 17 from the bank or anyone else. Mr. Tillman only obtained a copy when he went to the bank on or about September 5, 2025. The bank did not provide Mr. Tillman with the questionnaire to the bank.

a judgment against him. Chase gave Mr. Tillman the number of F&G to call.

37.     This was Mr. Tillman's first time learning of this lawsuit against him.

*From June 5 to through July, Defendants ignored the repeated demands of an attorney to release the exempt funds.*

38.     Afraid of calling F&G alone, Mr. Tillman reached out to Bettina Hollis, a lawyer representing him in an unrelated matter, for help.

39.     On or about June 5, 2025, Mr. Tillman called F&G with Ms. Hollis on the line.

40.     Ms. Hollis repeatedly told F&G, in that call and in multiple follow up communications, that Mr. Tillman was disabled and the money in the bank account they were restraining was from social security disability payments. Ms. Hollis asked for documents about the lawsuit and the judgment as Mr. Tillman was never served and knew nothing about the lawsuit. But even after months following up, F&G would not release Mr. Tillman's account or provide any documents about the lawsuit, such as an affidavit of service.

41.     Ultimately, Ms. Hollis told Mr. Tillman that there was nothing else she could do for him, F&G was ignoring her, and this was not within her field of practice. She gave Mr. Tillman the names of other attorneys and suggested he call them to see if they could assist him.

*On August 5, Defendants levy on Mr. Tillman's bank account, leading Mr. Tillman to make a frantic call to F&G on August 8, who doubled down illegally threatening to take even more money.*

42.     On or about August 5, 2025, Defendants unlawfully levied $9,561.94 of Social Security disability funds from Mr. Tillman's Chase bank account, even though Ms. Hollis repeatedly put them on notice that the money in the bank account was from social security disability and that Mr. Tillman was never served with the lawsuit. *See* **Exhibit 16** (Chase Bank Statements, Combined, 2024-10-08 to 2025-08-08).

43.     Frantic, on August 8, 2025, Mr. Tillman called F&G and spoke with an employee at the

law firm identifying herself as Donna Greene for over 28 minutes.

44.     Ms. Greene told Mr. Tillman that there had been a judgment entered against him by Defendants approximately 10 years prior.

45.     She also attempted to confirm Mr. Tillman's address by reading out multiple addresses, none of which were his correct address.

46.     During that call, Mr. Tillman repeatedly explained that they had restrained his bank account and that he was on disability. Mr. Tillman, a low-income double-amputee, pleaded with F&G to release his bank account.

47.     However, F&G did not mention the Exemption Claim Form Mr. Tillman was supposed to receive.

48.     F&G also did not disclose that disability money was exempt from restraint.

49.     And most simply, F&G did not ask for proof (e.g. bank statements, disability statement from Social Security Administration, or the completion of a sworn Exemption Claim Form) that would demonstrate the money was exempt.

50.     Mr. Tillman also requested information about the 2015 lawsuit and judgment causing the restraint on his account because he knew nothing of the lawsuit. Defendants did not provide that information on the call.

51.     Instead, F&G doubled down: they used the unlawful restraint to try to pressure Mr. Tillman to settle and make payments.

52.     Ms. Greene was unmoved when Mr. Tillman expressed his concern and anger with Defendants' extraction of his funds from SSD benefits. She stated to Mr. Tillman that his money was already gone and that there was nothing he could do.  She said the money could not be recovered without a court order.

53.     She also stated that Defendants had given Mr. Tillman a break by reducing the balance alleged.

54.     Ms. Greene threatened Mr. Tillman that they could get a court order and get the rest of the money. She said that they would take further legal action against Mr. Tillman to levy even more of his savings. When Mr. Tillman asked what other option he had, she represented that his only option was to enter into a payment plan, requiring him to repeatedly relinquish additional exempt funds to Defendants.

55.     This was false even if *none* of the money in the bank account was exempt. That is because, under EIPA, a minimum amount of money in any bank account is exempt, regardless of the source. The first $4,080 in a bank account are exempt from restraint or levy if there are no exempt funds in the account, and the first $3,425 are exempt from restraint or levy if the account contains some exempt funds.

56.     F&G pressured Mr. Tillman to enter a payment plan – to "voluntarily" pay additional amounts of exempt funds under the threat of losing everything. The balance in the account was the remainder of his life's savings.

57.     Believing he had no choice, Mr. Tillman asked about setting up a payment plan to stave off losing everything. He believed this was the only way he could protect what little remaining funds he had in his bank account from being wiped out entirely. Desperate to avoid additional levies, Mr. Tillman said he could pay as much as $100 per month. But when he asked Ms. Greene what the remaining balance was after accounting for the levy, she refused to provide this information and said she did not know what it was. And when he asked about dates for when payments would start, he was unable to obtain this information from Ms. Greene either. As a result, he was ultimately unable to reach a payment agreement because he could not obtain even the most

basic information about the amount of the alleged debt and other information necessary to agree to terms.

58.     Mr. Tillman first got documentation about Defendants' 2015 case against him not from lawful service of the Summons and Complaint, not from notice of any Motion or Default Judgment, and not after his attorney Bettina Hollis repeatedly requested documentation from Defendants about the restraint on his account, but by traveling to a Chase branch on or about September 5, 2025 and requesting documentation from an employee at the branch. *See* **Exhibit 17** (Documents Received from Bank, September 5, 2025). And even then, it was just the caption of the case and the documents with the Restraint, including the exemption claim form.

59.     It was only then, from an employee of Chase, that Mr. Tillman even learned the caption of the case and who had sued him: *Atlantic Credit & Finance Special Finance Unit, LLC A/P/O Citibank N.A. vs Willie L Tillman*, Kings County Civil Court Index No. CV-018798-15/KI.

60.     It was only months later, after The Legal Aid Society obtained the court file for this case, that he learned that Defendants had filed a consumer credit case against him on April 1, 2015 and obtained a judgment against him for an alleged consumer debt on September 4, 2015. *See* **Exhibit 9** (Summons and Complaint, CV-018798-15-KI); **Exhibit 18** (Civil Judgment, CV-018798-15-KI).

61.     Defendants then began enforcing this judgment against Mr. Tillman nearly a decade later without notice to him, let alone proper inquiry as to whether his funds were exempt.

### *Social Security benefits cannot be frozen or levied under federal and state law.*

62.     All of the income in Mr. Tillman's Chase account is SSD directly deposited by the Social Security Administration.

63.     As such, all the funds in the account were exempt from restraint and garnishment.

64.    The Social Security Act, 42 U.S.C. § 407 (the "SSA"), states that no money paid or payable under the Act "shall be subject to execution, levy, attachment, garnishment, or other legal process."

65.    Further, the United States Department of the Treasury introduced regulations ("the regulations") that went into effect on May 1, 2011, providing that a financial institution must allow an account holder access to a "protected amount", which is the lesser of the sum of all benefit payments posted to the account in the last two months, or the balance in an account when the account review is performed. 31 CFR § 212.3.

66.    However, the "protected amount" does not limit an individual's right to assert further exemptions from garnishment or restraint. 31 CFR § 212.8(a).

67.    The regulations also do not preempt State laws governing garnishment practices, allowing States to further protect federal benefit payments from freezes or garnishments. 31 CFR § 212.9(b).

68.    Moreover, in 2008, New York State enacted the Exempt Income Protection Act ("EIPA"), to prevent widespread problems involving the restraint of bank accounts containing exempt funds.

69.    EIPA protects statutorily exempt income from restraint, "freeze", or levy.

70.    EIPA also expedites and standardizes the process for the release of restrained exempt funds.

71.    Under EIPA, when a judgment debtor's bank account is restrained pursuant to a New York restraining notice, the judgment debtor may claim that the funds in the restrained account are exempt by completing an Exemption Claim Form.

72.    Under EIPA, a judgment creditor must provide such an Exemption Claim Form to the

14

judgment debtor's banking institution along with any restraining notice.

73.    The judgment debtor's banking institution must mail the Exemption Claim Form to the judgment debtor within two days of its receipt of the restraining notice from the judgment creditor.

74.    To facilitate the prompt release of an account containing exempt funds, the Exemption Claim Form instructs judgment debtors to submit "proof" that the funds in their account are exempt. N.Y. CPLR § 5222-a(b)(2).

75.    Proof of an exemption can "include an award letter from the government, an annual statement from your pension, pay stubs, copies of checks, bank records showing the last two months of account activity, or other papers showing that the money in your bank account is exempt". *Id.*

76.    When a judgment debtor sends a judgment creditor an Exemption Claim Form accompanied by such "information demonstrating that all funds in the account are exempt", the restraint is deemed void and the judgment creditor must instruct the banking institution to release the account within seven days of the postmark on the envelope containing the Exemption Claim Form. N.Y. CPLR § 5222-a(c)(4).

77.    If the judgment creditor fails to act accordingly, the judgment creditor shall be deemed to have acted in bad faith.

***After months of frantic searches to find an attorney, Mr. Tillman ultimately finds help from The Legal Aid Society, but even then Defendants refuse for weeks to return the money.***

78.    In or around August 2025, Mr. Tillman's attorney in another matter, Bettina Hollis, recommended that Mr. Tillman seek separate counsel to represent him regarding the restraint and levying of funds in his bank account by Defendants as this was not within her field of practice.

79.    Mr. Tillman called multiple private consumer law attorneys and free legal services

15

providers to seek legal advice, but they all said they could not help him.

80.    Eventually, after much time seeking counsel dedicated to this matter, one of the private consumer attorneys with whom Mr. Tillman met referred him to The Legal Aid Society.

81.    Mr. Tillman then contacted The Legal Aid Society's Consumer Law Unit through a public hotline on August 12, 2025, seeking assistance regarding the restraint and levy of his bank account. His intake appointment with an attorney in the the Consumer Law Unit was scheduled for September 10, 2025.

82.    Due to the severity and urgent nature of Mr. Tillman's matter, he first spoke with a Paralegal Casehandler with The Legal Aid Society on September 3, 2025, prior to his scheduled appointment, to discuss and address the restraint and levy of his bank account. The Legal Aid Society agreed at this time to provide limited-scope legal service regarding the restraint and levy of Mr. Tillman's bank account.

83.    Although by this time Defendants had restrained Mr. Tillman's account for months and subsequently levied funds from it, Mr. Tillman had never received a copy of the Exemption Claim Form.

84.    The Legal Aid Society instructed Mr. Tillman to go to his local Chase Bank branch, request and complete the Exemption Claim Form, and send a copy to Chase and to F&G according to the instructions in the form.

85.    On or around September 5, 2025, Mr. Tillman went to his local Chase Bank branch and obtained the Exemption Claim Form. He completed the Exemption Claim Form indicating his account contained SSD, signed it, and gave it to a Chase representative at the branch who then faxed it to Chase's legal department.

86.    On September 10, 2025, The Legal Aid Society faxed to the office of F&G a completed

Exemption Claim Form on behalf of Mr. Tillman, which indicated that Mr. Tillman's Chase bank account contained exempt SSD funds. *See* **Exhibit 19** (Demand Letter and Exemption Claim Form, September 10, 2025).

87.     Simultaneously, The Legal Aid Society also faxed a demand letter requesting that F&G return the funds that were levied from Mr. Tillman's account, which were exempt from levy under state and federal law. *See id.*

88.     On September 12, 2025, having not received any response to the faxed letter or Exemption Claim Form, Mr. Tillman traveled to the post office and paid to send a copy of these documents via certified mail bearing the tracking number 9589 0710 5270 2973 8931 36 to the office of F&G. *See* **Exhibit 19** (Demand Letter and Exemption Claim Form, September 10, 2025); **Exhibit 20** (USPS Payment Receipt, September 12, 2025).

89.     On September 18, 2025, Mr. Tillman retained The Legal Aid Society for full representation in the underlying state court action in which the Defendants sought to enforce a default judgment by levying Mr. Tillman's exempt funds.

90.     On October 3, 2025, The Legal Aid Society, on Mr. Tillman's behalf, provided a second letter, but this time by certified mail bearing the tracking number 7019 1640 0001 3827 2405 with return receipt requested to the office of F&G. *See* **Exhibit 21** (Certified Mail Receipt on Demand, October 3, 2025); **Exhibit 22** (Front Envelope on Demand, October 3, 2025). This letter again informed Defendants that Mr. Tillman was the recipient of Social Security Disability, enclosed the third completed Exemption Claim Form along with Mr. Tillman's Social Security Disability Benefit Verification Records, and demanded the return of the unlawfully levied funds by October 13, 2025. The letter also stated that Mr. Tillman had retained The Legal Aid Society as counsel. *See* **Exhibit 23** (Demand Letter, October 3, 2025).

91.    On October 6, 2025, Defendants received the demand letter sent by The Legal Aid Society on behalf of Mr. Tillman, as evidenced by the signed certified mail return receipt, which confirmed delivery and acceptance by "Gail Carpenter," an agent or representative of F&G and Abrahamsen Gindin LLC. *See* **Exhibit 24** (Signed Return Receipt for the Demand Letter, October 6, 2025)

92.    On October 15, 2025, despite Defendants having received the demand letter from, F&G mailed correspondence directly to Mr. Tillman, rather than his attorneys at The Legal Aid Society, referencing a purported settlement in the underlying state court case in which Defendants sought to enforce a default judgment by levying Mr. Tillman's bank account. The letter made no mention of returning the funds F&G had unlawfully levied, nor did it acknowledge receipt of the Exemption Claim Form which had by that time been provided to the Defendants on three separate occasions. *See* **Exhibit 25** (F&G Letter to W Tillman, October 15, 2025).

93.    By December, F&G still had not returned the funds it had levied from Mr. Tillman nor contacted The Legal Aid Society to respond to the letters requesting the return of the funds.

94.    On December 22, 2025, The Legal Aid Society sent via certified mail its third letter with Mr. Tillman's fourth Exemption Claim Form to F&G demanding that it lift all restraints it had placed on Mr. Tillman's bank account and return all funds unlawfully levied from Mr. Tillman's bank account by December 29, 2025. *See* **Exhibit 26** (Demand Letter, December 22, 2025).

95.    Having received no response to any of the faxes and letters sent to F&G, The Legal Aid Society was able to locate an email address for Ed Damsky, a senior attorney at F&G.

96.    At 10:42 AM on December 22, 2026, The Legal Aid Society emailed a copy of the December 22, 2025 Demand Letter to Mr. Damsky, as well as to New York City Marshal Ronald Moses, who apparently was the marshal who levied the account.

97.    At 4:34 PM that very same day, out of the blue, Mr. Scully emailed curtly stating "The

18

refund for the property execution is being processed. I apologize for the delay in processing this." This was the first time anyone at F&G, or purportedly working on their behalf, acknowledged Mr. Tillman's request that the unlawfully levied funds be returned to him. *See* **Exhibit 27** (Email Chain, Legal Aid Society and James Scully, 2025-12-22 to 2026-2-18).

98.     It was only after the FDCPA defense attorney at F&G, James Scully, learned of his firm's unlawful conduct – and risk of FDCPA liability – that Defendants did anything but ignore Mr. Tillman and his attorneys.

99.     On December 24, 2025, Mr. Tillman received two checks from F&G—one check in the amount of $8,982.41 and the other in the amount of $472.76—representing a portion of the amount F& G unlawfully levied from him. *See* **Exhibit 28** (Refund Checks from F&G to W Tillman).

100.    The letter which accompanied this initial refund of most, but not all, of Mr. Tillman's wrongfully-levied money was from Defendant AG, despite the checks themselves being drawn from an account of F&G, suggesting close integration of the firms' operations and control of F&G by AG. *See* **Exhibit 29** (Confirmation of Refund, December 24, 2025).

101.    On January 6, 2026, after noticing that Mr. Tillman was not fully reimbursed by the initial two checks, The Legal Aid Society again contacted James Scully to inquire about the return of Mr. Tillman's levied funds. Finally, F&G issued another check on January 8, 2026, in the amount of $206.77, which corresponded to the remaining amount of the levy and a reimbursement for legal and poundage fees which had been charged to Mr. Tillman by the Marshal and Chase in connection with the levy. *See* **Exhibit 28** (Refund Checks from F&G to W Tillman).

102.    The Legal Aid Society emailed Mr. Scully to ask if he would voluntarily vacate the default judgment as Mr. Tillman was never served. Mr. Scully responded to ask if Mr. Tillman would release all claims he might have against the judgment creditor *and* Mr. Scully's firm. When Mr.

Tillman rejected such a provision in order to vacate the default, Mr. Scully did not respond to multiple emails asking if he would vacate the default judgment given the false affidavit of service.

103.     Upon information and belief, F&G is refusing to vacate a default judgment entered against Mr. Tillman by way of a false affidavit service unless Mr. Tillman releases his claims against Defendants for their flagrant violations of the FDCPA and related claims.

***Defendants sent Mr. Tillman into a panic, upending the stability he was finally able to establish from his double amputation.***

104.     Defendants' unlawful restraint, levy, and misrepresentations caused Mr. Tillman significant emotional distress.

105.     The nearly $10,000 which Defendants caused to be restrained and then levied represented nearly all of the money that Mr. Tillman, an individual with mobility disabilities on a fixed income, had to his name. As previously noted, under federal and state law social security disability payments are entirely exempt from restraint or exempt.

106.     Learning for the first time of the lawsuit and judgment against him, anxiety coursed through Mr. Tillman's body. Feeling as though he had lost his bearings, he had to go out to his building's recreational area to try to catch his breath. It took several hours to calm himself from the waves of panic that came from learning of the judgment against him and losing access to his funds.

107.     Defendants responded to Mr. Tillman's and counsels' repeated notifications that their restraint and levy were a restraint on disability benefits and a hardship to Mr. Tillman at first with indifference, then with threats to take even more of Mr. Tillman's exempt funds away.

108.     Mr. Tillman had made repeated good faith efforts to recover his exempt funds that were unlawfully extracted by Defendants, but he was consistently disregarded and ignored. Experiencing such disregard is, unfortunately, is all too common for individuals of limited

20

financial means, those with disabilities, and those from historically marginalized communities. But while Mr. Tillman is not unfamiliar with this type of treatment, it does not make it any less painful.

109.    Mr. Tillman struggled to manage the waves of panic that came over him starting when he first learned of the lawsuit and judgment against him and continuing for the months thereafter in which he and Bettina Hollis repeatedly contacted Defendants attempting to resolve the unlawful judgment enforcement against him.

110.    Mr. Tillman started sleeping poorly, when he had previously been able to sleep through the night. The phantom pain where his legs once were went from an occasional pins-and-needles sensation to now feeling like he was being stabbed with ice picks.

111.    For Mr. Tillman, the loss of his funds was always at the back of his mind. He felt a dark cloud come over him and as though he could not share his struggles with anyone. As he worried about funds, he was unable to buy even a $20 jacket, and restricted where and how he was eating even though food had been one of his greatest joys.

112.    When Mr. Tillman received additional demands to settle and allow continuous extraction of his exempt funds from Defendants, he sat with his head against the wall, feeling trapped. It seemed as though there was nothing he could do to stop Defendants from continuing to take his SSD benefits away from him as he lived each day with trepidation, despite having made a joyful existence for himself until what he had carefully saved had suddenly disappeared.

### *Because of Defendants' conduct, Mr. Tillman suffered a monetary injury.*

113.    As a result of Defendants' unlawful conduct, Mr. Tillman suffered multiple tangible economic injuries. The biggest damage, of course, is having most of his life's savings restrained and then seized for many months.

114.    After Defendants levied $9,561.94 of exempt funds from Mr. Tillman's bank account, Mr. Tillman sought legal assistance from The Legal Aid Society, which helped him prepare an Exemption Claim Form. The Exemption Claim Form asserted that the account which Defendants levied contained exempt SSD benefits. The Legal Aid Society faxed this form to the office of F&G on September 10, 2025. *See* **Exhibit 19** (Demand Letter and Exemption Claim Form, September 10, 2025).

115.    On September 12, 2025, when Defendants failed to return the improperly levied funds or otherwise respond to the faxed Exemption Claim Form, Mr. Tillman paid $6.08 to send a copy of the Exemption Claim Form to F&G via certified mail. *See* **Exhibit 20** (USPS Payment Receipt, September 12).

116.    Mr. Tillman only needed to pay to mail a copy of the form to F&G because of Defendants' unlawful levying of his exempt funds and failure to respond to the faxed copy. This expense has not been reimbursed by Defendants or anyone else.

117.    Mr. Tillman also incurred multiple rideshare expenses as a result of Defendants' unlawful conduct.

118.    Mr. Tillman paid $10.28 to Uber on September 5, 2025, to travel from his home to Chase Bank after Defendants unlawfully levied funds from his account. He made this trip to obtain documents related to Defendants' unlawful levy, including the blank Exemption Claim Form. *See* **Exhibit 30** (Uber Receipt, Penn to Linden, September 5, 2025).

119.    On September 12, 2025, Mr. Tillman paid $13.28 to travel to the post office to send F&G the completed Exemption Claim Form via certified mail and another $14.17 travelling home. *See* **Exhibit 31** (Uber Receipt Stanley to Flatlands, September 12, 2025); **Exhibit 32** (Uber Receipt Flatlands to Livonia, September 12, 2025).

120.   When F&G failed to respond to Mr. Tillman's September 10 and 12, 2025 Exemption Claim Forms and the demand for the of return the funds, and he had yet to receive confirmation from Chase that it had received the Exemption Claim Form he submitted to them in person at his local branch on September 5, 2025, Mr. Tillman again travelled to his bank on October 24, 2025, to give the bank another copy of the completed Exemption Claim Form. He paid Lyft $5.94 to get to the bank and $10.49 to ride from the bank back to his home. *See* **Exhibit 33** (Lyft Receipts, Penn to Linden, Van Siclen to Livonia, October 24, 2025).

121.   In total, Mr. Tillman spent $54.16 on rideshare expenses because of Defendants' unlawful activity.

122.   Mr. Tillman was deprived of the time value of money when Defendants unlawfully levied and temporarily deprived him of his exempt funds.

123.   On August 5, 2025, Defendants levied $9,561.94 from Mr. Tillman's bank account. Mr. Tillman also incurred a $100 "Legal Processing Fee" charged by his bank when Defendants initially restrained his account on or around June 2, 2025.[4] S*ee* **Exhibit 16** (Chase Bank Statements, Combined, 2024-10-08 to 2025-08-08).

124.   Months later, on December 24, 2025, Mr. Tillman received a partial reimbursement from Defendants for the levy. F&G issued two checks, accompanied by a letter from AG, to Mr. Tillman—one check in the amount of $8,982.41 and the other in the amount of $472.76—which together totaled $9,455.17.[5] *See* **Exhibit 28** (Refund Checks from F&G to W Tillman).

125.   The Legal Aid Society, which by this point had informed F&G that it was fully representing

---

[4] Chase Bank first charged a $100 "Legal Processing Fee" on June 2, 2025. This charge was reversed on June 6, 2025. However, Chase Bank charged another $100 "Legal Processing Fee" on June 6, 2026, which Chase Bank never reversed.

[5] Although the refund checks themselves were issued by F&G, AG sent Mr. Tillman a letter indicating that they were issuing the refund checks, evidently on behalf of F&G.

Mr. Tillman in this matter, then informed Defendants that this partial refund did not fully return the funds Defendants levied and did not reimburse Mr. Tillman for the $100 "Legal Processing Fee." *See* **Exhibit 27** (Email Chain, Legal Aid Society and James Scully, 2025-12-22 to 2026-2-18).

126.   Finally, F&G issued another check to Mr. Tillman in the amount of $206.77 on January 8, 2026, which corresponded to the remaining amount of the levy and a reimbursement for the "Legal Processing Fee." *See* **Exhibit 28** (Refund Checks from F&G to W Tillman).

127.   Although Defendants eventually returned the unlawfully levied funds to Mr. Tillman, and reimbursed him for the "Legal Processing Fee," Mr. Tillman did not have the ability to use or earn interest on these funds during the months between when he was deprived of the funds and when they were finally returned.

128.   Defendants did not pay interest to Mr. Tillman or otherwise compensate him for this lost time value of money.

> ### Defendants have a pattern and practice of violating New York law in attempting to collect on a debt.

129.   The Attorney Defendants, Atlantic Defendants and MCM each have a history of violating the law in an attempt to collect a debt, including attempting to garnish, freeze and levy sums to which they are not entitled.

130.   As a result, these violations are consumer-oriented and impact a large number of consumers in New York and nationwide.

<u>Forster & Garbus</u>

131.   In 2019, the federal Consumer Financial Protection Bureau ("CFPB") brought an enforcement action accusing F&G of relying on non-attorney support staff, automation, and a customarily cursory and deficient review of account files that resulted in unlawful attempts to

collect a debt, thus violating the FDCPA's prohibition against the use of false, deceptive, or misleading representations. *See* Complaint, *Bureau of Consumer Financial Protection v. Forster & Garbus, LLP*, Ind. No. 19-cv-2928 (E.D.N.Y.).

132.   In 2023, the CFPB and F&G settled the matter, and the court entered a stipulated judgment and order requiring meaningful attorney review of cases. *See* Stipulated Final Judgment and Order, *Bureau of Consumer Financial Protection v. Forster & Garbus, LLP*, Ind. No. 19-cv-2928 (E.D.N.Y.).

133.   Soon after the CFPB brought its lawsuit, in 2020, New York State's Department of Financial Services ("DFS") issued a "Statement of Charges and Notice Hearing" against F&G, charging it with ignoring consumers' requests to substantiate a debt. Under New York law, once a consumer requests to "substantiate a debt" —meaning proof that the consumer actually owes the debt—a debt collector must provide that information within 60 days of the request.

134.   In its charges, DFS recounts individual consumers who asked to substantiate a debt and instead of doing that, F&G ignored the request and sued the consumer on the debt.

135.   Further, F&G has been sued multiple times for behavior like the type alleged here: garnishing or levying funds when it is illegal to do so.

136.   In *Rodriguez v. Forster & Garbus LLP*, 14-cv-8700 (S.D.N.Y), Plaintiff, through their legal services attorney, alleged that F&G sought to garnish Plaintiff's wages, sending notice to Plaintiff's employer, for a judgment that not only had been paid, but that F&G acknowledged it had been paid by submitting an affidavit in the underlying state civil court action stating that the judgment was paid in full.

137.   In *Callender v. Forster & Garbus LLP*, 15-cv-05813 (S.D.N.Y), Plaintiff, through his legal services attorneys, alleged that F&G garnished his wages even though the underlying state civil

court action had been dismissed because of the debt buyer's failure to appear. Further, when Plaintiff continued to receive letters from F&G stating that he owed this debt, Plaintiff filed a complaint with DCWP[6] against F&G. F&G's response to the complaint admitted that its client had instructed it to cease collection activity.

138. Yet, three years after the dismissal of the underlying state civil court action and two years after F&G's admission to DCWP that the debt buyer instructed it to cease collection activities, F&G garnished the Plaintiff's wages.

139. Upon information and belief, Defendants' conduct is not an isolated incident, but rather part of a broader pattern and practice of unlawful debt collection activity. Defendants file debt collection lawsuits against consumers and obtain default judgments through means of not effectuating proper service which is consistent with "sewer service" tactics. As a result, many consumers are deprived of notice and the opportunity to be heard, which in and of itself is a direct violation of consumers' due process rights under the Fourteenth Amendment of the U.S. Constitution.

140. Upon review of publicly available consumer complaints that are submitted to the DCWP and the CFPB about F&G, these complaints reflect a consistent pattern of this conduct.

141. For example, there are multiple complaints from the CFPB database reported by consumers not receiving actual notice of a lawsuit filed against them and in some reports additionally, notice of a judgment. It is only years later when the Attorney Defendants seek to enforce these judgments through wage garnishment, bank restraints, bank levies, or other means of collection activities, that the consumer learns about the underlying state court case. This is also true with regard to Mr.

---

[6] In the complaint, DCWP is referred to by its predecessor name, New York City Department of Consumer Affairs ("DCA"). In 2019, DCA changed its name to DCWP, expanding its role to enforce worker protections in addition to consumer protections.

Tillman's underlying state court action in which The Legal Aid Society has filed an order to show cause to vacate the deceptive default judgment.

142.     Moreover, one complaint submitted to DCWP describes a situation in which the consumer did not receive any collection notices before the lawsuit was commenced nor the Summons and Complaint after the lawsuit was commenced.  The consumer only learned about the action five years after the lawsuit was commenced when the Attorney Defendant sought to enforce a default judgment against them through a wage garnishment. This is similar to what happened to Mr. Tillman, who first learned of the 2015 lawsuit and default judgment entered against him when his bank account was restrained.

143.     This pattern of the Defendants' actions coupled with the CFPB enforcement actions clearly demonstrates employing false, deceptive and unfair means to collect an alleged debt.

Atlantic Defendants and MCM

144.     Since 2019, 15 federal civil actions have been filed against Defendant ACF, 14 of which claim violations of the FDCPA.

145.     In the most recent federal civil action, *Valkova v. Law Offices of Steven Cohen LLC, Steven Cohen, Atlantic Credit & Finance Inc, and John Does 1-5*, 21-cv-941 (N.D.N.Y.), Plaintiff similarly alleges that ACF attempted to collect on a judgment—this time through a wage garnishment—when it was not entitled to do so.

146.     In the *Valkova* complaint, ACF obtained a default judgment in 2008 but waited until 2021 to attempt to collect on the default judgment. Plaintiff alleges that this coincided with a change in attorneys to Kirschenbaum & Phillips PC.

147.     Kirschenbaum & Phillips PC is a wholly owned subsidary of Defendant AG.

148.     As alleged in the *Valkova* complaint, the judgment that ACF attempted to collect on was

27

vacated by stipulation in 2011. As a result, there was no judgment upon which ACF had a right to collect.

149.    Furthermore, in 2020, after a lengthy investigation, the Massachusetts Attorney General entered into a settlement with ACF, MCM and their parent company, Encore Capital Group, Inc., for attempting to collect on debts where they did not have sufficient evidence that the debt was owed.

150.    Additionally, in 2015, the CFPB also took action against Encore Capital Group Inc., the Atlantic Defendants' parent corporation, for its collection on debts where the debts were inaccurate, Encore lacked documentation of the debt, or the debt was unenforceable.

## FIRST CLAIM

**Violations of Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*.**
**(Against All Defendants)**

151.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

152.    The purpose of the Fair Debt Collections Practices Act ("FDCPA") is "to eliminate abusive debt collection practices by debt collectors, to ensure that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e); *see also Hamilton v. United Healthcare of La., Inc.* 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

153.    Congress designed the FDCPA to be enforced primarily through private parties, such as

Plaintiff, acting as "private attorneys general." *See* S. Rep. No. 382, 95th Con, 1st Sess. 5, ("The committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance . . . ."); and *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008) ("In this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated Counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

154.    The obligation alleged to be owed by Plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative debt was allegedly incurred primarily for family, personal or household purposes specifically for a personal credit card. The Summons and Complaint in the underlying collection lawsuit states the action is for the collection of a "Consumer Credit Transaction. Further, Plaintiff has never had a business account.

155.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt" as defined by 15 U.S.C. § 1692a(5).

156.    For the reasons set forth in the "Parties" section of this Complaint, Defendants are "debt collectors" as defined in 15 U.S.C. § 1692a(6).

157.    Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692(c)(a)(2), 1692e and 1692f. By way of example and not limitation, Defendants materially violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: communicating directly with a consumer when they know or have reason to know the consumer is represented by counsel; using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; falsely

29

representing or implying that a communication is from an attorney; threatening to take and actually taking an action prohibited by law; using any false, deceptive or misleading representations or means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

158.   As a direct and proximate result of Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment, humiliation, anxiety, loss of sleep, mailing costs, attorneys' fees, transportation costs, and the time value of money.

159.   The injuries inflicted on Plaintiff by the Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

160.   Plaintiff suffered economic injuries that historically have provided a basis for lawsuits in American courts, including but not limited to out-of-pocket expenses, costs of transportation, and the loss of the time value of money during the time Defendants temporarily deprived Plaintiff of his exempt funds.

161.   Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: conversion, negligence, invasion of privacy, intrusion upon seclusion, and abuse of process.

162.   Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of personnel to attempt to collect the debt, in ensuring that property exempt from execution is not restrained, levied or garnished, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

**SECOND CLAIM**

**Violation of New York General Business Law § 349**
**(Against All Defendants)**

163.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

164.    New York General Business Law § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state." An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. L. § 349(h).

165.    N.Y. Gen. Bus. Law § 349 *et seq.* is a strict liability statute, and thus there is liability regardless of whether it can be established that Defendants' actions were intentional.

166.    As enumerated above, Defendants violated New York Gen. Bus. Law § 349 by using deceptive acts and practices in the conduct of their businesses. This includes: seeking to collect on a judgment by restraining an account (or garnishing wages) without performing any review, much less a meaningful attorney review by Attorney Defendants, of whether the account sought to be restrained contains exempt funds, even after repeatedly being put on notice and receiving lawful notices of exemption.

167.    These acts were done by Defendants systematically and, as such, have had a broad impact on consumers at large.

168.    Upon information and belief, Defendants routinely oppose lawful claims of exemption by New York consumers, even after receiving notices of exemption, and opposes or ignores these exemption claims without performing any review, much less meaningful attorney review by

31

Attorney Defendants, of whether the claims of exemption are valid.

169.    In the alternative, Defendants routinely oppose exemption claims knowing that there is no reasonable basis for the challenge in hopes of coercing payments from the exempt account.

170.    Further, as enumerated above Defendants violated N.Y. Gen. Bus. Law § 349 *et seq.* by using deceptive acts and practices in the conduct of their businesses. This includes, but is not limited to, levying funds Defendants knew or should have known to be exempt, and failing to provide information about the underlying collection lawsuit when Defendants promised to do so.

171.    Defendants committed the above-described acts willfully and/or knowingly.

172.    The Defendants' deceptive conduct towards Plaintiff is the type of conduct that has a broad impact on consumers at large.

173.     Defendants' violations were willful and knowing, or, at minimum, evidence a conscious and reckless disregard for basic fairness and for the law. Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

174.    As a direct and proximate result of Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment, and humiliation.

175.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

176.    Atlantic Credit Defendants are directly liable as the judgment creditor and are vicariously liable for the acts of Attorney Defendants.

177.    Plaintiff suffered economic injuries that historically have provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for mailings, for transportation costs, and for a legal fee.

32

178. Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: wrongful litigation, negligence, invasion of privacy, intrusion upon seclusion, and abuse of process.

179. Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts, including properly processing Exemption Claim Forms and ensuring that protected income is neither frozen nor levied.

180. Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and unless enjoined will cause further irreparable injury.

181. As a direct and proximate result of those violations of N.Y. Gen. Bus. § 349, Plaintiff has suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and damages, together with costs and attorney's fees.

## THIRD CLAIM

### Conversion
### (Against All Defendants)

182. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

183. Defendants are jointly and severally liable for conversion. Atlantic Credit Defendants, as the party in the collection lawsuit, and MCM, acted through their agents, Attorney Defendants, F&G and AG, in converting Mr. Tillman's money. F&G and AG were acting within the course and scope of the authority given to them by Atlantic Credit Defendants and MCM. For the purposes of the conversion claim, the acts of F&G and AG are the actions of Atlantic Credit Defendants and MCM.

184. The elements of conversion in New York State include: (1) having a possessory interest in

33

property; and (2) having the possessory interest taken or interfered with by another in a manner that is contrary to the possessor's rights.

185.    Property subject to conversion includes funds contained in bank accounts.

186.    Defendants, intentionally and without authority, assumed and exercised control over Plaintiff's bank account funds with a false affidavit of service, despite being put on notice by Plaintiff and his legal services counsel that the funds were exempt from execution, interfering with his right to possession of the same.

187.    In other words, Defendants never had a legitimate basis or authority to restrain and then seize Plaintiff's bank account, and thus the bank account garnishment form it constitutes conversion.

188.    Defendants' improper seizure of and failure to immediately return Plaintiff's money, which harmfully interfered with Plaintiff's rights to control her own property, constitutes conversion.

189.    For the reasons stated in the statement of facts, Defendants' conduct was gross, wanton or deliberate and demonstrates a high degree of moral culpability. The conduct demonstrates malice, insult, and/or willful or reckless disregard of Plaintiff's rights, or other aggravated acts. Defendants' conduct evidences a high degree of moral culpability, or is so flagrant as to transcend mere carelessness, or constitutes willful or wanton negligence or recklessness to justify a punitive damage award.

190.    For these reasons, Plaintiff is entitled to punitive damages, in addition to actual damages. Actual damages include, *inter alia*, the loss of use of money for the period Defendants wrongfully exercised dominion and control over Plaintiff's funds, and consequential damages resulting therefrom. Plaintiff suffered serious mental distress and disruption of his daily life.

## FOURTH CLAIM

### Gross Negligence
### (Against All Defendants)

191.    Plaintiffs repeat and reallege each and every allegation set forth above as if reasserted and realleged herein.

192.    Had Defendants exercised even slight diligence they would have known their conduct was unlawful.

193.    Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

194.    Defendants' actions evince a reckless disregard for the rights of Plaintiff and others. The actions have the appearance of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

195.    Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Plaintiff is entitled to a punitive damage award.

196.    Defendants owed Plaintiff a duty pursuant to the FDCPA, which is designed to protect consumers in part by prohibiting debt collectors from using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; using false, deceptive or misleading representations or means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

197.    Creditors and debt collectors in general owe debtors a duty of reasonable care in collecting their debts. *Hawkins-El v. First American Funding, LLC*, 891 F. Supp. 2d 402, 412 (E.D.N.Y. 2012), aff'd 529 F. Appx. 45 (2d Cir. 2013).

198.    New York General Business Law § 349 also imposes on Defendants a duty to not engage in deceptive acts and unlawful practices in the conduct of their business.

35

199. Defendants breached these duties.

200. As a direct and proximate result of Defendants' breach of these duties, Plaintiff suffered compensable harm, including actual damages and emotional distress.

201. Defendants' conduct was so flagrant as to transcend mere carelessness and constitute willful negligence or recklessness. Upon information and belief, Defendants have engaged in a pattern and practice of similar behavior against others. As a result, Plaintiff is entitled to actual and punitive damages.

## DEMAND FOR JURY TRIAL

202. In accordance with Fed. R. Civ. P. 38(b), Mr. Tillman demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

(a) Assume jurisdiction of this action;

(b) Declare that Defendants' actions violate the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.*, New York General Business Law § 349, and constituted conversion and gross negligence;

(d) Enjoin Defendants from committing similar deceptive practices in the future;

(e) Award Plaintiff actual damages; statutory damages pursuant to 15 U.S.C. § 1692k(a) and New York General Business Law §§ 349(c) and 349(h); and punitive damages for conversion and gross negligence;

(f) Award costs and attorneys' fees to the Plaintiff; and

(g) Award Plaintiff such other and further relief as may be just and proper.

36

Dated: April 24, 2026
      Queens, New York

                        Respectfully Submitted,

                        THE LAW OFFICE OF AHMAD KESHAVARZ

                        */s/Ahmad Keshavarz*
                        Ahmad Keshavarz
                        16 Court St., 26th Floor
                        Brooklyn, NY 11241
                        Tel: (718) 522-7900
                        Fax: (877) 496-7809
                        Email: ahmad@NewYorkConsumerAttorney.com

                        THE LEGAL AID SOCIETY

                        */s/ Ellen McCormick*
                        Ellen McCormick
                        Claire Mooney
                        153-01 Jamaica Ave, Suite 202
                        Jamaica, NY 11432
                        Tel: (347) 573-0161
                        Email: emccormick@legal-aid.org